USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/16/12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**HILAJAH S. STOVER,**

**Plaintiff,**

**- against -**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

**REPORT AND RECOMMENDATION**

**11 Civ. 0172 (RMB) (RLE)**

**To the HONORABLE RICHARD M. BERMAN, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff Hilajah S. Stover ("Stover") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits. Stover asks the Court to modify the Commissioner's decision and grant him monthly maximum benefits, retroactive to the date of the initial disability, or, in the alternative, to remand the case for reconsideration of the evidence. Stover argues that the decision of the Administrative Law Judge ("ALJ") was erroneous and not supported by substantial evidence. On September 20, 2011, the Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and dismiss the Complaint. For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED** and that the case be **DISMISSED.**

## II. BACKGROUND

### A. Procedural History

Plaintiff's mother, Virginia Stover, applied for disability insurance benefits and social security income on March 3, 2006, on behalf of Stover, who was then a minor. (Administrative Record ("A.R.") at 138-40.)[1] The application was denied[2] on January 2, 2007, (*id.* at 98) and on April 28, 2007, Stover requested a hearing before an ALJ. (*Id.* at 102-04.) On August 4, 2009, Stover and his mother appeared with an attorney and testified at a hearing before ALJ Mark H. Shapiro. (*Id.* at 39-68.) The ALJ subsequently issued an opinion finding that Stover was not disabled under the Act and was not entitled to disability insurance benefits. (*Id.* at 6-28.) Stover requested review by the Appeals Council on September 25, 2009. (*Id.* at 4-5.) On November 30, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Stover's request for review. (*Id.* at 1-3.) Stover filed this *pro se* action on January 3, 2011. (*See* Doc. 2.)

### B. The ALJ Hearing

#### 1. Testimony on behalf of Stover at the Hearing

Stover was born on September 6, 1990. (A.R. at 138.) He has epilepsy, a skin disorder, and allergies. (*Id.* at 40.) Stover has also been seeing a psychotherapist, (*Id.* at 40), whom he began seeing because he found he had no motivation to do anything. (*Id.* at 42.) Stover stopped going to school after the tenth grade because he was not doing well, (*id.* at 48), and is not currently seeking a GED or high school diploma. (*Id.* at 45.) He had been held back in the sixth and ninth grades because he did not meet the work requirements for many of his courses. (*Id.* at 55.) He missed several classes in the sixth grade because of his visits to the hospital and because

[1] "A.R." refers to the administrative record filed by the Commissioner with his Answer. (*See* Doc. 14.)
[2] An earlier application had been denied on January 26, 2004. (A.R. at 146.)

he was adjusting to new medication. (*Id.* at 64.) He fell asleep often in class because of his medication. (*Id.* at 66.) During the day, Stover spends time with his friends. (*Id.*) He likes to attend basketball games, to rap, and to read magazines. (*Id.* at 46.) He does not drive or play sports because of his seizure disorder, but does not have a problem traveling by public transportation. (*Id.*) His skin problems and allergies do not interfere with any of his activities. (*Id.*)

Stover lives with his mother and brother. (*Id.* at 43.) He generally wakes between 12:00 - 1:00 p.m. and goes to bed at approximately 12:00 - 1:00 a.m. (*Id.*) He has no trouble sleeping, nor does he have trouble bathing, feeding, or dressing himself. (*Id.*) He makes his own meals and has no trouble cooking. (*Id.* at 44.) He is capable of helping with house cleaning, laundry, and grocery shopping. (*Id.*) There is no reason he would not be able to work if he wanted to, but he lacks motivation. (*Id.* at 48.) He was fired from two summer jobs overseeing five-year old children during the summers of 2005 and 2006 (*id.* at 48-52) because he was not active enough with the children (*Id.*)

In 2005, Stover was seeing a doctor six times a year because of his epilepsy. (*Id.* at 53.) During that period, the doctor increased the dosage of his medication, Carbatrol, which he is still taking. (*Id.* at 53.) One side effect of Carbatrol is drowsiness, which he has discussed with his therapist, Dr. Geller, and his medical doctor, Dr. Grinspan. (*Id.* at 57.) Stover gets sleepy in the afternoon every day, and when this sleepiness occurs, he lays down for approximately three hours. (*Id.* at 54.) Dr. Grinspan wanted to switch Stover to another medication that might have relieved the drowsiness, but Stover was not interested because the last time he switched medications in 2001, his seizures returned. (*Id.* at 58.) Stover used marijuana once in March 2009, and drinks alcohol approximately once every three months. (*Id.* at 69-70.)

Stover testified that if he had a job offer, he would be interested in trying to work and would go to sleep earlier. (*Id.* at 58-60.) He indicated a desire to work in a clothing store, but admitted that he has no experience in such a store, has not applied to work in one, and would probably get tired. (*Id.*) Despite going to bed earlier when attending school, Stover would still be tired after school. (*Id.* at 60.)

**2. Medical Evidence**

Stover's earliest medical report on record is dated April 14, 1999. (*Id.* at 205.) His pediatrician, Dr. Mary McCord, had referred him to New York Presbyterian Hospital. (*Id.* at 217.) Although hospital records indicate that Stover went to the hospital because of a new onset seizure, an electroencephalogram ("EEG") revealed no abnormalities. (*Id.*)

On May 28, 1999, Stover was admitted to the epilepsy monitoring unit at New York Presbyterian for three days. (*Id.* at 218.) In the three months prior to the visit, he had experienced tonicoclonic seizures, lasting two to three minutes. (*Id.*) During his epilepsy monitoring, Stover had episodes of dizziness, head deviation, and arm stiffening. (*Id.*) An EEG also revealed some abnormalities at the onset of a seizure. (*Id.*) Dr. Douglas Nordli recommended that Stover take anti-epileptic medication, and Stover began taking Tegretol. (*Id.*) He also recommended that Stover continue to follow up with the pediatric neurology clinic for check-ups. (*Id.* at 218-19.)

Dr. Rachel Kupferman, a pediatric neurologist from New York Presbyterian Hospital, wrote in October 2006 that Stover has had epilepsy since 1998, and that he had experienced increased seizure frequency beginning in November 2005. (*Id.* at 207.) Since 2005, the pediatric neurology clinic had monitored him closely. (*Id.*) Prior to November 2005, Stover was taking

carbamazepine XR, 600 mg in the morning and 900 mg at night, and had improved seizure control. (*Id.* at 207.)

An EEG conducted on March 22, 2002, revealed abnormalities due to discharges suggesting a potential epileptogenic lesion in the parietal region. (*Id.* at 215.) Another EEG, dated December 27, 2004, indicated abnormalities while awake and asleep, suggesting mild encephalopathy. (*Id.* at 213.) Additionally, occasional epileptiform discharges were noted in the posterior paracentral region, suggesting an epileptogenic focus in that region.[3] (*Id.*)

An April 11, 2006 medical record notes that Stover visited New York-Presbyterian Hospital due to his increasing sleepiness. (*Id.* at 211.) Dr. Rebecca Miriam Gilbert wrote that Stover had poor sleeping habits. (*Id.*) He would play video games for hours, then go to sleep at around midnight, and wake up at 6:15 a.m. for school. (*Id.*) Stover's mother, however, felt that his sleepiness was excessive and that there must be another factor causing it. (*Id.*) Dr. Gilbert indicated that her plan was to conduct an MRI, admit Stover for twenty-four hours, and advise him to improve his sleeping habits by getting eight hours of sleep a night. (*Id.*)

The medical records also describe a May 30, 2006 outpatient visit at New York-Presbyterian Hospital. (*Id.* at 208.) Dr. H. Christian Schumacher wrote that the reason for the visit was a seizure disorder. (*Id.* at 207.) The hospital records on this date describe the history of Stover's epilepsy. (*Id.*) Dr. Schumacher indicated that Stover had been diagnosed with complex partial seizures at age eight and had been maintained on Tegretol and then Carbatrol. (*Id.*) The Tegetrol medication controlled his seizures until November 2005, when he had a seizure during which his eyes rolled to the back of his head, he experienced tongue movements, slurred speech,

[3] An epileptogenic focus refers to abnormal neuron activity focused in a specific location of the brain. During a seizure, this abnormal activity rapidly spreads to other regions of the brain. *See* Pieter va Mierlo, et. al., *Accurate epileptogenic focus localization through time-variant functional connectivity analysis of intracranial electroencephalographic signals*, 56 NeuroImage 1122 (Jun. 1, 2011), *available at* http://www.ncbi.nlm.nih.gov/pubmed/21316472.

stiffening, and full body shaking, which lasted three to four minutes. (*Id.*) He had another seizure in 2006, and visited the hospital on February 28. (*Id.*) An EEG conducted in March 2006 was negative. (*Id.* at 207.) An MRI conducted May 3, 2006, revealed no intracranial mass effect, hemorrhage, or tissue damage, (*id.* at 220), and revealed no significant change from an MRI conducted on March 22, 2002. (*Id.* at 209.) Stover experienced another seizure on May 26, 2006, and his dosage of Carbatrol was increased to 300 milligrams every six hours. (*Id.* at 207.) Dr. Schumacher noted that during the May 30, 2006 visit, Stover was awake, alert, and well oriented. (*Id.* at 209.) His motor examination, coordination, stance, and gait were normal. (*Id.* at 209.) Dr. Schumacher noted that Stover's seizures were not well controlled during a phase of his physical growth. (*Id.* at 210.) The medical records also indicate that Stover had additional seizures on July 7, 2006, August 8, 2006, and again in March 2007, when his last seizure occurred. (*Id.* at 244-45, 268, 293.)

Stover went to the Children's Hospital of New York at New York-Presbyterian Hospital, Columbia University Medical Center, in April 2009 after feeling symptoms of a seizure. (*Id.* at 40, 290.) He stayed in the hospital overnight, where medical personnel checked his "blood level" and performed an electrocardiogram. (*Id.* at 41.) A neurological examination performed on April 7, 2009, indicated that Stover had an abnormal sedated mood and that his cranial nerves were abnormal. (*Id.* at 269.) His coordination and gate were also abnormal. (*Id.* at 270.) All other findings were normal, and the overall assessment was that the Carbatrol was controlling the epilepsy well. (*Id.* at 270, 290.) A letter from a clinical psychotherapist, Bibiana Geller, dated August 3, 2009, indicated that Stover had been seeing her for psychotherapy sessions since June 12, 2009, and that he had been diagnosed with major depressive disorder. (*Id.* at 291.)

**3. Teacher Questionnaire**

On November 16, 2006, Stover's ninth grade teacher, Ms. Grova, and social worker, Ms. Arroyo, submitted a questionnaire assessing Stover's abilities. (*Id.* at 180-87.) They wrote that they knew Stover for a year and a half, and saw him each day for forty-five minutes. (*Id.* at 180.) They did not observe Stover having any difficulty acquiring or using information, but found that he had some slight problems attending to and completing tasks. (*Id.* at 182.) They observed that he preferred to work alone and that working independently seemed to keep him focused and on task. (*Id.* at 182.) They indicated that he had no problem interacting with peers and working in a group when necessary, that they could understand Stover's speech, and that he had no problems moving about or manipulating objects. (*Id.* at 183-84.) Additionally, they saw no problems in Stover's care for himself. (*Id.* at 185.) Ms. Grova and Ms. Arroyo did not know whether Stover's functioning changed after taking his medication. (*Id.* at 186.)

**4. The ALJ's Findings**

On September 25, 2009, ALJ Mark H. Shapiro issued his decision that Stover was not disabled within the meaning of the Social Security Act. (*Id.* at 6-28.) The ALJ found that Stover had not been disabled since February 16, 2006—the date his application was filed. (*Id.* at 10.) The ALJ found that the medical records established that Stover has a severe impairment—his seizure disorder, (*id.* at 14), but that the disorder lacked the frequency and duration necessary to meet the listed impairments in 20 C.F.R. § 404. (*Id.* at 15.) The ALJ also found that Stover might be using drugs and alcohol more than he had indicated in his testimony, which might be contributing to his symptoms. (*Id.* at 19.) He also concluded that Stover's drowsiness is "not as bad as he claims," since he has declined attempts to reduce his drowsiness by changing his medication or sleep pattern. (*Id.* at 19.) The ALJ found that transferability of job skills is not an

issue since Stover has no past relevant work. (*Id.* at 27.) Lastly, the ALJ found that since attaining the age of 18, there have been significant numbers of jobs available that Stover can perform. (*Id.* at 27.)

**C. Appeals Council Review**

After the ALJ's decision, Stover requested a review by the Appeals Council on September 25, 2009. (*Id.* at 4-5.) The Appeals Council denied Stover's request for review on November 30, 2010. (*Id.* at 1-3.)

**D. DISCUSSION**

**A. Standard of Review**

A court reviewing a denial of Social Security benefits does not assess the issue of a claimant's eligibility *de novo. Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991). Rather, this Court's inquiry is limited to determining whether the Commissioner applied the correct legal principles in reaching a decision and, if so, whether that decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987); *Donato v. Secretary of Health and Human Service,* 721 F.2d 414, 418 (2d Cir. 1983); 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a scintilla." *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Levine v. Gardner,* 360 F.2d 727, 730 (2d Cir. 1966); *Smith v. Shalala,* 856 F. Supp. 118, 121 (E.D.N.Y.1994).

If the court finds that the Commissioner applied the correct legal standard and that the Commissioner's determination is supported by substantial evidence, the court must uphold the Commissioner's determination. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 401; *Donato,* 721 F.2d at 418. The court must uphold a denial of benefits supported by substantial evidence even in cases where there is substantial evidence supporting the plaintiff's position, *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent analysis of the evidence would differ from the Commissioner's. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

**B. Determination of Disability**

**1. Evaluation of Disability Claims**

The Act's definition of disability for the purposes of disability insurance and SSI is substantially the same. *Hankerson v. Harris,* 636 F.2d 893, 895 n. 2 (2d Cir. 1980). For an individual to be considered disabled, he must have a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months and, as a result, be unable to engage in any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant is not considered disabled if he is able to engage either in his previous work or any other substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c (a)(3)(B). Both the inability to engage in gainful activity and the medical condition must last for twelve months for the individual to be found disabled. *See Barnhart v. Walton,* 535 U.S. 212, 217-22 (2002).

Stover was under age eighteen at the time of the application, but reached the age of eighteen before the date of the decision. Therefore, the ALJ was required to determine whether

Stover was disabled under the meaning of the Social Security Act both before and after attaining the age of eighteen. 20 C.F.R. § 416.924(f).

To determine whether an individual under the age of eighteen is disabled, the Commissioner must conduct a three-step inquiry: (1) determine whether the claimant is engaged in any substantial gainful activity; (2) if so, determine whether the claimant has a "severe impairment" which significantly limits his ability to work; (3) if so, determine whether the impairment is one of the listings listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, for which the Commissioner presumes disability. *See* 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. To determine whether an impairment or combination of impairments equals the listings, the Commissioner must consider six factors: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; 6) health and physical well-being. 20 C.F.R. § 416.926(a)(d). Although the ALJ applied this analysis, whether Stover was properly adjudicated non-disabled as a juvenile is not before this Court on appeal.

To determine whether an individual over the age of eighteen is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is engaged in any substantial gainful activity; (2) if so, determine whether the claimant has a "severe impairment" which significantly limits his ability to work; (3) if so, determine whether the impairment is one of the conditions for which the Commissioner presumes disability; (4) if not, determine whether the claimant is able to perform his past work despite the disability; and (5) if not, determine whether the claimant can perform other work. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving the first four steps, while the burden of proving the fifth is on the Commissioner. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll v. Sec'y of Dep't of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). The Commissioner must assess the claimant's residual functional capacity ("RFC") to apply the fourth and fifth steps of the inquiry to the claimant. A claimant's RFC represents the most that claimant can do despite limitations caused by his impairments and related symptoms. 20 C.F.R. § 404.1545(a). The Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history. *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ must also evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden of proving the first four steps, while the burden of proving the fifth is on the Commissioner. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll v. Sec'y of Dep't of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). In making the fifth-step determination of whether there is any other work claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll*, 705 F.2d at 642).

2. **The Court finds that the ALJ properly reviewed and considered the evidence, and applied the correct legal principles.**

*The ALJ Properly Applied the Requisite Sequential Analysis*

This Court's first task is to assess whether the Commissioner applied the correct legal principles in determining Stover's eligibility. Stover contends that the ALJ's decision was erroneous, not supported by substantial evidence on the record, and/or contrary to law. (Petitioner's Complaint ("Pet'r Compl.") at ¶ 9.) The Commissioner maintains that the ALJ properly applied the correct legal principles in reaching his decision. The Court agrees with the Commissioner, and finds that the ALJ properly followed the requisite sequential analysis and held that Stover was not disabled within the meaning of the Act and that he retained the residual functional capacity to work. (A.R. at 26.)

In reaching his conclusion, the ALJ conducted the tests required by 20 C.F.R. §§ 404.1527, 416.920, and 416.926a for individuals both over and under the age of eighteen. The ALJ found that Stover was not disabled as a child and is not disabled as an adult. (*Id.* at 24, 28.) Although Stover's seizure disorder is a severe impairment, (*id.* at 14, 24), the ALJ found that it does not meet the listings in Appendix I of the regulations. (*Id.* at 15, 25.) The ALJ also found that Stover is not engaged in substantial gainful activity and has not performed any relevant past work, but is capable of working and therefore does not qualify for SSI benefits. (*Id.* at 14, 27-28.)

The ALJ reached his decision by observing Stover at the hearing and by analyzing the evidence, including medical records and expert testimony from three doctors (a psychiatrist, a neurologist, and a pediatrician). The ALJ examined the medical records and found that Stover's seizures did not occur with the frequency and duration necessary to meet the listings, as he has not had a seizure since 2007, did not have more than one seizure per month, and his disorder did

not impact his IQ or ability to communicate. (*Id.* at 15.) He also took into consideration the opinions of Stover's former school teacher and social worker, who stated that, in their opinion, Stover had no difficulty acquiring and using information, interacting with others, moving about and manipulating objects, or caring for his personal needs. (*Id.* at 17, 180-87.) They opined that he had slight problems attending and completing tasks. (*Id.*)

*Substantial Evidence Exists to Support the ALJ's Determination*

While Stover's records confirm that he has a seizure disorder, and was diagnosed with the condition at the age of eight, the records also reveal that his seizures are well-controlled by his current medication, (*see* A.R. at 290), and that he has not suffered a seizure since 2007. (*See* A.R. at 293.) In August 2009, child neurologist, Zachary Grinspan, who treated Stover at New York-Presbyterian, found that Stover has no limitations related to his cognitive functions, although he did state he would need to refer to neuropathic testing. (*Id.* at 296.) Dr. Grinspan also found that while Stover suffers from epilepsy, his condition is well-controlled with medication. (*Id.* at 305-09.) In September 2009, Dr. Herb Meadow conducted a psychiatric evaluation of Stover and found no limitations related to his condition that would impair his ability to function in a work environment. (*Id.* at 297-98.)

Testimony at the hearing also supports the ALJ's conclusion. At the hearing, Stover testified that there was no reason he would not be able to work if he wanted to, and that he would be interested in working if offered a job. (A.R. at 48, 58.) He also stated that he believes he can work full-time at a clothing store and follow instructions. (*Id.* at 58-59.) Stover's medical records and his testimony at the hearing provide substantial evidence for the ALJ's decision that Stover's seizure disorder does not preclude him from engaging in work, so long as it is limited to simple tasks and he is not required to operate machinery or be exposed to unprotected heights.

The ALJ's determination was reasonable because he considered Stover's medical records, the testimony of both Stover and his mother, information provided by Stover's teacher and social worker, and the opinions of the medical experts. According to Dr. Willer and Dr. Goldstein, the only limitation on Stover's ability to work was that he should not perform work that requires the operation of heavy machinery, driving, or swimming. (A.R. at 80, 91.) The ALJ reasonably determined that Stover is not disabled because he retains the capacity to perform unskilled work that does not require such tasks. The ALJ's denial of disability is also based on Stover's disability assessment prior to turning eighteen years old, which found either minor limitations or no limitations in 2006. (*Id.* at 235-38.)

Accordingly, the Commissioner's decision that Stover is not eligible for SSI benefits was determined under the correct legal standard and supported by substantial evidence.

*Stover's Limitations*

The ALJ did find a limitation in Stover's capabilities beyond what the consultative psychiatrist and expert neurologist determined. (*Id.* at 26). Although medical expert and psychiatrist Dr. Herb Meadow found that Stover had no limits in his ability to understand, remember, and carry out instructions, the ALJ found that the evidence supported a determination of limitations in that area. (*Id.*) Similarly, while Dr. Justin Willer, a neurologist and medical expert, found no correlation between Stover's medication and drowsiness (suggesting that the drowsiness could possibly be caused by Stover's poor sleeping habits), the ALJ found that the evidence suggested a connection between Stover's drowsiness and his medication, concluding that his medication restricts him to simple tasks. (*Id.*) The ALJ found, however, that Stover's limitations do not prevent him from performing "unskilled work at all exertional levels," with the

exception of work where operation of heavy machinery or exposure to unprotected heights is involved. (*Id.* at 27-28.)

## E. CONCLUSION

For the reasons set forth above, I recommend that the defendant's motion be **GRANTED,** and that the Complaint be **DISMISSED.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard M. Berman, 500 Pearl Street, Room 1320, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(d).

**DATED: March 16, 2012**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

**Copies of this Report and Recommendation were sent to:**

Plaintiff, *Pro Se*
Hilajah S. Stover
2831 Exterior Street, Apt. 13C
Bronx, NY 10463

Attorney for Defendant
Leslie A. Ramirez-Fisher
Assistant United States District Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007